IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EMMA RAE HASKER,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )        1:16CV367
                                          )
FRANCISCO ARGUETA, a/k/a FRANCISCO )
ROTUI, a/k/a FRANCISCO ROMERO,            )
ALDO DIPUORTO, MARIA DIPUORTO,            )
and THE ALDO DIPUORTO and MARIA           )
DIPUORTO PARTNERSHIP,                     )
                                          )
                    Defendants.           )

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff initiated this action on March 23, 2016, in state court, alleging gender discrimination and retaliation in violation of 42 U.S.C. § 2000e-2 *et seq.* ("Title VII"), as well as various state law claims. (ECF No. 14.) Defendants timely removed the action to the U.S. District Court for the Western District of North Carolina, (ECF No. 1), and subsequently filed a motion to transfer venue to the Middle District of North Carolina, (ECF No. 11). The court entered an Order granting Defendants' motion and transferring the action to this Court. (ECF No. 12.) Before the Court is Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6). (ECF No. 17.) For the reasons set forth below, Defendants' motion will be denied.

## I.    BACKGROUND

Defendants Aldo DiPuorto, Maria DiPuorto, and the Aldo and Maria DiPuorto Partnership ("Defendant Owners") own and operate restaurants under the name "Elizabeth's

Pizza," one of which is located in Thomasville, North Carolina.  (ECF No. 14 ¶ 6.)  In February 2014, Plaintiff was hired as a waitress by Kim Morgan Wilkes ("Wilkes"), the restaurant's Waitress Manager/Head Waitress.  (*Id.* ¶ 7.)  Wilkes served as Plaintiff's supervisor, responsible for the training, scheduling, and calculation of payroll for the waitress staff.  (*Id.*)  While employed at the restaurant, Plaintiff's job performance was "competent and satisfactory."  (*Id.*)  Francisco Argueta ("Argueta"), who had been hired by Defendant Owners in or about 2002, was employed at the restaurant as its Kitchen Manager.  (*Id.* ¶¶ 8, 9.)  Argueta also "served as the general manager of the restaurant whenever Defendant Aldo DiPuorto and/or his son, Gino DiPuorto,[1] were not present, which was most of the time."  (*Id.* ¶ 8.)

Several times during Plaintiff's first few weeks of employment, "Argueta asked [her] . . . if she would like to hang out with him after work to have drinks and smoke pot."  (*Id.* ¶ 14.)  Plaintiff told Argueta "that she was not interested."  (*Id.*)  At the time, Plaintiff was twenty years old and Argueta "was approximately forty-five years old."  (*Id.*)  On Sunday, March 9, 2014, after Plaintiff had worked a six-hour shift that ended at 10:30 pm, she "sat down in the restaurant to eat."  (*Id.* ¶ 15.)  Argueta approached Plaintiff, offered her a beer, and told her to "go get beer from the cooler."  (*Id.*)  Plaintiff complied, and returned with two beers.  (*Id.*)  Argueta "encourage[d] Plaintiff to drink . . . alcohol," pouring her a glass of wine, and "three to four shots of liquor."  (*Id.* ¶¶ 15, 16.)  "At some point Plaintiff told . . . Argueta that she did not want to drink anything else because he was not drinking, and Argueta then drank a shot."  (*Id.* ¶ 16.)

---

[1] Gino DiPuorto is the son of Defendants Aldo and Maria DiPuorto, and Plaintiff alleges that he "was an employee, general manager and agent of the Defendant Partnership," (ECF No. 14 ¶ 5).

Plaintiff then left the building and walked outside into the restaurant parking lot, as did Argueta. (*Id.* ¶ 17.) While in the parking lot, "Argueta began making sexual advances to Plaintiff, pushing himself up against her and trying to kiss her." (*Id.* ¶ 18.) Despite Plaintiff's attempts to push Argueta away, he "continued to press up against her" and "unbutton [her] pants." (*Id.*) Plaintiff was shocked, "pushed Argueta's hands away[,] . . . buttoned her pants … [and] attempted to move away." (*Id.*) Argueta then "pushed Plaintiff up against his van" and began kissing her, while rubbing his hands on her body. (*Id.*) Argueta "then put one of his hands down [Plaintiff's] pants." (*Id.*) Plaintiff pulled away from Argueta and despite trying to convince her to stay with him, Plaintiff, who was upset, went to her car and left the parking lot. (*Id.*)

The next day, Monday, March 10, 2014, Argueta called Plaintiff before work and told her that her supervisor, Wilkes, and Gino DiPuorto, the general manager, "had seen Plaintiff and . . . Argueta 'on the [surveillance] tape' and that they were going to ask Plaintiff about it." (*Id.* ¶ 19.) Argueta told Plaintiff to tell Wilkes and Gino DiPuorto that "nothing happened," they were "just hanging out," and that the incident was "consensual and casual." (*Id.*) Plaintiff then received a telephone call from Wilkes who asked Plaintiff "to come in early because she needed to talk to [her]." (*Id.* ¶ 20.) When Plaintiff arrived at the restaurant, she had an initial meeting with Wilkes, followed by a meeting with both Wilkes and Gino DiPuorto. (*Id.* ¶ 21.) During that meeting, Plaintiff told Gino DiPuorto that she had been given alcohol by Argueta who "had tried to pressure her into having sex with him." (*Id.*) Plaintiff also told Gino DiPuorto that Argueta "had shoved his hand down her pants, against her will." (*Id.*) Gino DiPuorto began yelling at Plaintiff and "characterized the whole incident as if it were Plaintiff's

3

fault." (*Id.*) He then took away all of Plaintiff's subsequent Sunday shifts, and threatened to "immediately fire" Plaintiff if she "'messed up' again." (*Id.*)

Following this incident, Plaintiff "was forced to work with . . . Argueta every time she worked," and he "continued to make advances to [her], repeatedly asking and suggesting that they get together after work." (*Id.* ¶ 24.) After telling "Argueta that she did not want to go out with him or have any kind of relationship with him outside of work," he began to act "angry and spiteful toward Plaintiff." (*Id.* ¶¶ 24, 25.) On several occasions, Plaintiff complained about Argueta's conduct to Wilkes, who "promptly relayed these complaints to the Defendant Owners." (*Id.* ¶ 25.) Nevertheless, Argueta's behavior continued. (*Id.*)

On or about May 7, 2014, Argueta "began yelling and cursing at Plaintiff" so loudly that Wilkes "could hear Argueta from the other side of the restaurant." (*Id.* ¶ 26.) Argueta also "repeatedly threatened to fire Plaintiff and repeatedly told her that he would get rid of her if she did anything wrong at all." (*Id.*) Plaintiff became upset and cried, and again complained to Wilkes, telling her that "she felt like Argueta was retaliating against [her] for refusing to have a sexual relationship with him." (*Id.* ¶ 27.) In response, Wilkes told Plaintiff that "Argueta had done this type of thing many times before, that the owner knew about it, and that she (Wilkes) could not do anything to stop him." (*Id.*) Plaintiff resigned that day, May 7, 2014. (*Id.*)

Approximately one month later, on June 17, 2014, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") based on gender discrimination and retaliation in violation of Title VII. (*Id.* ¶ 45.) On September 30, 2015, the EEOC issued a determination finding reasonable cause to believe that Plaintiff's

employer had violated Title VII. (*Id.*; ECF No. 19 ¶ 45.) The EEOC also issued a Notice of Right to Sue on December 31, 2015. (ECF No. 14 ¶ 45; ECF No. 19 ¶ 45.) Plaintiff then filed the instant lawsuit seeking compensatory and punitive damages, as well as injunctive relief. (ECF No. 14 at 9–10.) Defendants filed an Answer to Plaintiff's Complaint, (ECF No. 19), and subsequently moved to dismiss for failure to state a claim pursuant to Rule 12(b)(6), (ECF No. 17).[2]

## II.    STANDARD OF REVIEW

A motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure "challenges the legal sufficiency of a complaint," including whether it meets the pleading standard of Rule 8(a)(2). *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). Rule 8(a)(2) requires that a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), thereby "giv[ing] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A complaint may fail to state a claim upon which relief can be granted in two ways: first, by failing to state a valid legal cause of action, *i.e.*, a cognizable claim, *see Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012); or second, by failing to allege sufficient facts to support a legal cause of action, *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Dismissal under Rule 12(b)(6) is only appropriate "when the

---

[2] Where, as here, Defendants have filed an Answer, a Rule 12(b)(6) motion "should be viewed as a Rule 12(c) motion for judgment on the pleadings raising the defense of failure to state a claim upon which relief can be granted." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). As a practical matter, a Rule 12(c) motion is analyzed "under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013).

5

complaint 'lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281, 300 (M.D.N.C. 2015) (quoting *Brown v. Target, Inc.*, No. ELH-14-00950, 2015 WL 2452617, at *9 (D. Md. May 20, 2015)).

On a Rule 12(b)(6) motion, the Court must accept all factual allegations in the complaint as true, *Iqbal*, 556 U.S. at 678, and construe all factual allegations in the light most favorable to the plaintiff, *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "Although the Supreme Court has . . . made clear that the factual allegations in a complaint must make entitlement to relief plausible and not merely possible, . . . '[w]hat Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.'" *McLean v. United States*, 566 F.3d 391, 399 (4th Cir. 2009) (internal citations omitted) (alteration in original) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

## III. DISCUSSION

### A. Gender Discrimination and Retaliation under Title VII (Claim 4)[3]

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Before a plaintiff files suit under Title VII, she must exhaust her administrative remedies which requires that she, first, file a charge with the EEOC. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). A plaintiff's failure to exhaust

---

[3] Defendants removed this action from state court to federal court based on federal question jurisdiction under 28 U.S.C. § 1331. (ECF No. 1 ¶ 5.) Accordingly, the Court will, first, consider whether Plaintiff's federal claim should be dismissed pursuant to Rule 12(b)(6).

6

administrative remedies deprives the court of subject matter jurisdiction over the claim. *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). The parties here agree that Plaintiff has exhausted her administrative remedies with respect to her Title VII claims. (*See* ECF No. 14 ¶ 45; ECF No. 19 ¶ 45.) The Court therefore has subject matter jurisdiction over Plaintiff's Title VII claims.[4]

### 1. *Hostile Working Environment based on Gender Discrimination*

A plaintiff may bring suit against an employer under Title VII when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). To establish a claim for hostile work environment based on gender discrimination, a plaintiff must show "that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

Defendants contend that, as to the second element, Plaintiff "pleads no facts as to how [Argueta] treats male employees to show his behavior was based upon sex." (ECF No. 18 at 14.) While this may be true, a plaintiff may plead allegations of "explicit or implicit proposals of sexual activity" to satisfy this element because, as recognized by the Supreme Court, "it is reasonable to assume those proposals [in most male-female sexual harassment situations]

---

[4] The existence of the Court's subject matter jurisdiction is a threshold issue which must be addressed before considering the merits of the case. *See Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999.)

would not have been made to someone of the same sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Further, conduct that is "sexually motivated," rather than merely "sexual in content," also supports claims of discrimination based on sex. *See Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 260–61 (4th Cir. 2001).

Here, Plaintiff alleges that Argueta made sexual advances to her in the restaurant parking lot, which included: "pushing himself up against her and trying to kiss her;" kissing her; rubbing his hands on her body; and putting one of his hands down her pants. (ECF No. 14 ¶ 18.) Plaintiff also alleges that Argueta repeatedly asked her out and suggested that they get together after work. (*Id.* ¶ 24). These allegations, accepted as true, are sufficient to allege that Argueta's harassing conduct was based on Plaintiff's sex. *See Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) (explaining that "[a]n employee is harassed or otherwise discriminated against 'because of' . . . her sex if, 'but for' the employee's sex, . . . she would not have been the victim of the discrimination").

Despite having satisfied this element, however, "[n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996). To be actionable, the harassing conduct must be severe and pervasive, *i.e.*, "so extreme as to amount to a change in the terms and conditions of employment." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

The determination of whether conduct is severe or pervasive is both subjective and objective. *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). As such, a plaintiff "must show that [she] did perceive, and a reasonable person would perceive, the environment

to be abusive or hostile." *Id.*  Although a plaintiff may subjectively believe that the offending conduct created a hostile work environment, "[c]onduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21 (emphasis added).  In deciding whether conduct is sufficiently severe or pervasive to create an objectively hostile and abusive work, courts must consider the totality of the circumstances including: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with [the] employee's work performance." *First Union Nat'l Bank*, 202 F.3d at 242.  Such a determination, however, "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.

In this case, Plaintiff alleges that, during her "first week or two" at the restaurant, Argueta asked Plaintiff several times "to hang out with him after work to have drinks and smoke pot." (ECF No. 14 ¶ 14.)  Plaintiff's Complaint further alleges that approximately two weeks after being hired, on the evening of March 9, 2014, Argueta approached Plaintiff at the end of her shift and offered her beer, wine, and shots of liquor, which Plaintiff drank.  (*Id.* ¶¶ 15–16.)  Plaintiff alleges that she then left the restaurant to go to her car in the parking lot where the following incident occurred:

> Argueta began making sexual advances to Plaintiff, pushing himself up against her and trying to kiss her.  Plaintiff attempted to push Argueta away, but Argueta continued to press up against her. Argueta then began to unbutton Plaintiff's pants. Plaintiff was shocked and unsure how to respond, but pushed Argueta's hands away and buttoned her pants.  When Plaintiff attempted to move

9

> away, Defendant Argueta pushed Plaintiff up
> against his van and began kissing Plaintiff and
> rubbing his hands on her body and then put one
> of his hands down her pants. Plaintiff pulled away
> from Argueta and told him that she wanted to
> leave. Defendant Argueta tried to get Plaintiff to
> stay with him, but Plaintiff was too upset. Plaintiff
> then went to her car and both left the parking lot.

(*Id.* ¶¶ 17–18.) Plaintiff also alleges that, after the above incident, she was "forced to work

with . . . Argueta every time she worked, which was very uncomfortable," and he continued

making advances to her, including "repeatedly asking and suggesting that they get together

after work." (*Id.* ¶ 24). Plaintiff states that, after telling Argueta that "she did not want to go

out with him or have any kind of relationship with him outside of work," he "began acting

very angry and spiteful toward [her], making insulting comments to her." (*Id.* ¶ 24–25.)

According to the Complaint, on the day that Plaintiff "felt forced to resign," Argueta had

yelled at her, "telling her that she was stupid and always [f*****g] up." (*Id.* ¶¶ 26–27.)

Defendants argue that Plaintiff's allegations amount to "[o]ne incident after work,

outside of the premises, and one incident in which Plaintiff was yelled at [which] do not

support an objective claim of an environment 'permeated with discriminatory intimidation,

ridicule, and insult.'" (ECF No. 18 at 16–17 (quoting *Sunbelt Rentals*, 521 F.3d at 315).)

However, as explained by the Fourth Circuit, [u]nder the liberal rules of federal pleading, a

complaint should survive a motion to dismiss if it sets out facts sufficient for the court to infer

that all the required elements of the cause of action are present." *Wolman v. Tose*, 467 F.2d 29,

33 n.5 (4th Cir. 1972). Accordingly, at this stage in the proceedings, the allegations outlined

above are sufficient for the Court to infer that the severe or pervasive element of Plaintiff's

hostile work environment claim may be present. *See Conner v. R.H. Barringer Distribution Co.*,

152 F. Supp. 2d 856, 860 (M.D.N.C. 2001) (finding plaintiff's allegations, which included two examples of harassing remarks and one example of a physical encounter, sufficient to show severe or pervasive conduct at the motion to dismiss stage).

With respect to the fourth element of Plaintiff's hostile work environment claim – whether the allegedly harassing conduct may be imputed to the victim's employer – "[t]he status of the harasser" is relevant. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). If, on the other hand, the harassing employee is the victim's supervisor, "different rules apply" and the employer may be held "strictly liable" for the supervisor's harassing behavior if it "culminates in a tangible employment action." *Id.*

In this case, Plaintiff alleges that, although Argueta's job title was that of Kitchen Manager, he also served as general manager "most of the time." (ECF No. 14 ¶ 8.) Plaintiff makes no factual allegations, however, that Argueta exercised any actual supervisory control over the waitress staff. To the contrary, Plaintiff specifically alleges that she was hired by Wilkes who, as Waitress Manager/Head Waitress, served as her supervisor and who was responsible for the training, scheduling, and calculation of payroll for the waitress staff. (*Id.* ¶ 7.) As a result, the Court will analyze this element of Plaintiff's hostile work environment claim based on Argueta's status as a co-worker.

An employee may not "impute liability on an employer under a theory that the employer must exercise an all-seeing omnipresence over the workplace." *Howard v. Winter*, 446 F.3d 559, 567 (4th Cir. 2006). Thus, knowledge of co-worker harassment, may be imputed

to an employer if a "reasonable employer, intent on complying with Title VII," would have known about the harassment to which the plaintiff is subjected. *Spicer v. Commonwealth of Va., Dep't of Corrs.*, 66 F.3d 705, 710 (4th Cir. 1995); *see Ocheltree*, 335 F.3d at 333–34 ("[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it.")

Here, Defendants contend that "Plaintiff has not alleged, nor do her facts support" a claim that Defendant Owners were negligent in controlling the working conditions. (ECF No. 18 at 17.) The Court finds this argument unpersuasive, given the following allegations in Plaintiff's Complaint:

>  (i)   "Argueta has a long history of sexually harassing the waitresses employed by the Defendant Owners," (ECF No. 14 ¶ 9);
>
>  (ii)  During Argueta's employment at the restaurant, "multiple waitresses made complaints to Defendant Owners that Argueta engaged in sexually harassing conduct toward them and others," (*id.* ¶ 11);
>
>  (iii) "Wilkes repeatedly and concurrently" notified Defendant Owners of incidents of Argueta's "inappropriate physical activity with different waitresses," and Defendant Owners "took no action to discipline . . . Argueta or restrain him from continuing to engage in such activity," (*id.* ¶ 12);
>
>  (iv)  "Plaintiff informed Gino DiPuorto that . . . Argueta had given her alcohol and had tried to pressure her into having sex with him," (*id.* ¶ 21);

(v)    "Plaintiff also told [Gino DiPuorto] that . . . Argueta had shoved his hand down her pants, against her will," (*id.*);

(vi)    "Plaintiff complained to Wilkes on several occasions regarding Argueta's conduct, but was told by Wilkes that there was nothing she could do, and the retaliation and harassment toward Plaintiff continued. Wilkes nevertheless promptly relayed these complaints to the Defendant Owners" (*id.* ¶ 25);

(vii)    When Plaintiff complained to Wilkes that she (Plaintiff) "felt like Argueta was retaliating against [her] for refusing to have a sexual relationship with him . . .Wilkes told Plaintiff that . . . Argueta had done this type of thing many times before, that the owner knew about it, and that she (Wilkes) could not do anything to stop him," (*id.* ¶ 27); and

(viii)    "Although Defendant Owners were aware of . . . Argueta's sexually harassing conduct toward Plaintiff and others, including his sexual advances toward Plaintiff [and] his improper touching of Plaintiff, . . . at no time did they take any action to investigate Plaintiff's complaints, to discipline . . . Argueta, or to otherwise cause him to cease his inappropriate conduct toward Plaintiff and the other waitresses," (*id.* ¶ 28).

These allegations are sufficient to plausibly show that Defendant Owners knew or should have known about Argueta's harassment, yet failed to take any corrective action. Because the Court concludes that Plaintiff has sufficiently alleged facts to establish each element of her hostile working environment claim based on gender discrimination, Defendants' motion to dismiss this claim will be denied.

## 2. Retaliation

Plaintiff has also alleged a Title VII retaliation claim based on Argueta's retaliatory conduct, including Plaintiff's constructive discharge. Defendants argue that "Plaintiff has not alleged facts to push [this] claim from possible to plausible." (ECF No. 18 at 18.) The Court disagrees with Defendants.

In order to establish a prima facie case of retaliation under Title VII, Plaintiff must allege: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 566 U.S. 30 (2012). "[W]hile a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, . . . [Plaintiff's] factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted).

With respect to the first element of a retaliation claim, Title VII prohibits an employer from retaliating against an employee "because [she] has opposed any practice [that is] made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Plaintiff's allegations of having opposed Argueta's harassing conduct include: (i) reporting Argueta's allegedly harassing conduct to Wilkes, her supervisor, and to Gino DiPuorto, the restaurant's general manager,[5] (ECF No. 14 ¶¶ 21, 25,

---

[5] Defendants allege in their Answer that Gino DiPuorto "was employed at the restaurant as a cook for a limited period of time," and they deny Plaintiff's allegation that Gino DiPuorto was the general manager. (ECF No. 19 ¶ 5.) However, because Plaintiff is not required to reply to Defendants' Answer, at this stage in the litigation, allegations in the Answer "are taken as true only where and to

14

27); and (ii) refusing Argueta's advances by telling him that "she did not want to go out with him or have any kind of relationship with him outside of work," (*id.* ¶ 24). These allegations are sufficient to show that Plaintiff engaged in protected opposition activity. *See Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003) (stating that "[e]mployees are . . . guaranteed the right to complain to their superiors about suspected violations of Title VII"); *Fleming v. S.C. Dep't of Corrs.*, 952 F. Supp. 283, 288 (D.S.C. 1996) (explaining that "district courts have determined that opposition to unlawful employment practices under [Title VII] encompasses a person's refusal of sexual advances") (citing cases).

An employee's constructive discharge may constitute an adverse employment action when it occurs "in retaliation for the employee's exercise of rights protected by [Title VII]." *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984). "Constructive discharge occurs 'when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997) (internal quotations omitted) (quoting *Holsey*, 743 F.2d at 209). In order to establish a constructive discharge claim, a plaintiff must prove: (i) "deliberateness of the employer's action;" and (ii) "intolerability of the working conditions." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).

Plaintiff alleges that after reporting the incident involving Argueta's alleged inappropriate physical touching of Plaintiff, Gino DiPuorto yelled at Plaintiff "and retaliated against her by taking away all her subsequent Sunday shifts. He also threatened Plaintiff that

---

the extent they have not been denied or do not conflict with the complaint." *Jadoff v. Gleason*, 140 F.R.D. 330, 331–32 (M.D.N.C. 1991).

he would immediately fire her if she 'messed up' again." (ECF No. 14 ¶ 21). Plaintiff further alleges that, after refusing Argueta's continued sexual advances, Argueta "began acting very angry and spiteful" toward her, including yelling and cursing at her, in an "intentional effort to retaliate against [her] and cause her to quit." (*Id.* ¶¶ 25, 26.) According to the Complaint, by May 7, 2014, approximately three months after being hired, "[t]he situation was so bad, Plaintiff felt forced to resign, which Plaintiff did that day." (*Id.* ¶ 27.) Plaintiff has, therefore, sufficiently alleged that her constructive discharge was an adverse employment action.

Plaintiff may satisfy the third element of a Title VII retaliation claim, by sufficiently alleging that there is close temporal proximity between the adverse employment action and the protected activity. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (discussing that close temporal proximity may be "strongly suggestive of retaliatory motive and thus indirect proof of causation"). Although the Fourth Circuit has not adopted "a bright temporal line," the Court has held that a lapse of three or four months "between the protected activities and discharge was 'too long to establish a causal connection by temporal proximity alone.'" *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (unpublished) (quoting *Pascual v. Lowe's Home Ctrs., Inc.*, 1993 F. App'x 229, 233 (4th Cir. 2006) (unpublished)).

In this case, Plaintiff's protected activity of reporting Argueta's alleged inappropriate physical touching occurred on March 10, 2014. (*See* ECF No. 14 ¶ 21.) Then, at some point thereafter, Plaintiff refused Argueta's continued advances. (*Id.* ¶ 24); *see Fleming*, 952 F. Supp. at 288 (explaining that refusal of sexual advances is a protected activity under Title VII). Plaintiff's constructive discharge occurred on or about May 7, 2014 when "the situation was so bad [that she] felt forced to resign." (*Id.* ¶ 27.) Thus, there was approximately two (2)

months between Plaintiff's protected opposition activities and the adverse employment action. Courts have found very close temporal proximity where less than three months lapsed between the alleged protected activity and the adverse employment action. *See, e.g., Silva v. Bowie State Univ.*, 172 F. App'x 476, 478 (4th Cir. 2006) (unpublished) (finding a period of ten weeks between protected activity and adverse employment action sufficient to show causation and, thus, establish a prima facie case of retaliation); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (holding that a time period of two-and-a half-months between the protected activity and an adverse employment action was sufficiently close to make a prima facie showing of causation solely based on temporal proximity). Accordingly, the Court finds that Plaintiff has alleged sufficient facts to show close temporal proximity and thus, a causal link, between her protected activity and the adverse employment action.

The Court concludes that, taking Plaintiff's factual allegations as true, Plaintiff has stated a plausible claim for retaliation under Title VII. Defendants' motion to dismiss this claim will, therefore, be denied.

## B. Battery (Claim 1)

Plaintiff alleges that Argueta committed a battery on her person. (ECF No. 7 ¶¶ 29–31.) In North Carolina, the four elements of a claim for battery are: "intent, harmful or offensive contact, causation, and lack of privilege." *See Hawkins v. Hawkins*, 400 S.E.2d 472, 475 (N.C. Ct. App. 1991), *aff'd,* 417 S.E.2d 447 (N.C. 1992).

Defendants argue, in part, that "Plaintiff has alleged sufficient facts showing consent, such that the [battery] claim should be dismissed pursuant to Rule 12(b)(6)." (ECF No. 18 at

7.)  No such "facts showing consent" are found in Plaintiff's Complaint.  Instead, Plaintiff's specific factual allegations in support of her battery claim are as follows:

> Argueta began making sexual advances to Plaintiff, pushing himself up against her and trying to kiss her.  Plaintiff attempted to push Argueta away, but Argueta continued to press up against her. Argueta then began to unbutton Plaintiff's pants. Plaintiff was shocked and unsure how to respond, but pushed Argueta's hands away and buttoned her pants.  When Plaintiff attempted to move away, Defendant Argueta pushed Plaintiff up against his van and began kissing Plaintiff and rubbing his hands on her body and then put one of his hands down her pants.  Plaintiff pulled away from Argueta and told him that she wanted to leave.  Defendant Argueta tried to get Plaintiff to stay with him, but Plaintiff was too upset.  Plaintiff then went to her car and both left the parking lot."

(ECF No. 14 ¶ 18; *see also id.* ¶¶ 29–31).  Plaintiff also alleges that when Argueta called her the next day, "Argueta told Plaintiff that she should tell [Wilkes and Gino DiPuorto] that 'nothing happened' and that they were 'just hanging out.'  *He also told Plaintiff* to tell them that it was 'consensual and casual.'"  (*Id.* 14 ¶ 19 (emphasis added).)  Therefore, based on the actual allegations in Plaintiff's Complaint, the Court finds that Plaintiff has stated a plausible claim for battery.  The Court will deny Defendants' motion to dismiss this claim.

### C.  Vicarious liability of Defendant Owners for Battery (Claim 2)

An employer may be liable for the tortious conduct of its employee under the following circumstances: (i) if the employer expressly authorized the tortious behavior; (ii) if the tortious act occurred while the employee was acting within the scope of his employment or in furtherance of the employer's business; or (iii) if the employer ratified the employee's tortious conduct.  *Brown v. Burlington Indus., Inc.*, 378 S.E.2d 232, 235 (N.C. Ct. App. 1989).  Defendants

contend that "Plaintiff has not pled facts to support her claim that Defendant Owners ratified or authorized" the alleged tort committed by Argueta. (ECF No. 18 at 10.) The Court disagrees.

Defendants are correct that the Complaint contains no factual allegations that Defendant Owners expressly authorized Argueta's alleged battery on Plaintiff. Nor does the Complaint sufficiently allege that Argueta's tortious act occurred while he was acting within the scope of his employment.[6] The Complaint does, however, contain factual allegations which, accepted as true, show that the Defendant Owner's ratified Argueta's alleged battery on Plaintiff. An employer ratifies the tortious conduct of its employee if it "had knowledge of all material facts and circumstances relative to the wrongful act, and that the employer, by words or conduct, shows an intention to ratify the act." *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 122 (N.C. Ct. App. 1986).

Here, Plaintiff alleges that:

> (i)    the day after the alleged battery, Argueta called Plaintiff and told her that her supervisor, Wilkes, and Gino DiPuorto, the restaurant's manager, had viewed the restaurant's surveillance video footage "and that they were going to ask Plaintiff about it," (ECF No. 14 ¶ 19);

> (ii)    shortly after Argueta's telephone call, Plaintiff received a call from Wilkes asking Plaintiff to reported to work early for a meeting, and during that meeting (with

---

[6] Although the Complaint states that "Argueta served as the general manager of the restaurant . . . most of the time," (ECF No. 14 ¶ 8), the Complaint also states that Argueta's title was "Kitchen Manager," (*id.*), and that Wilkes, not Argueta, served as Plaintiff's supervisor, (*id.* ¶ 7). Further, according to the Complaint, Wilkes hired Plaintiff, and "was responsible for training the waitress staff, made out the waitress work schedules, and calculated their payroll." (*Id.*)

Wilkes and Gino DiPuorto), Plaintiff told them that Argueta "had tried to pressure her into having sex with him [and] had shoved his hand down her pants, against her will, (*id.* ¶¶ 20– 21);

(iii)  Gino DiPuorto yelled at Plaintiff, and "characterized the whole incident as if it were Plaintiff's fault, and retaliated against her by taking away all her subsequent Sunday shifts," (*id.* ¶ 21);

(iv)  Gino DiPuorto threatened to "immediately fire" Plaintiff if she "messed up" again, (*id.*);

(v)  following that meeting, both Aldo DiPuorto and Gino DiPuorto told Plaintiff "that she should not worry about it" and that "it happens," (*id.* ¶ 22); and

(vi)  Aldo DiPuorto also said "this kind of thing happens, [Argueta] decides he wants a pretty girl and it happens," (*id.*)

These allegations are sufficient to show that, following the alleged battery, Defendant Owners knew of the material circumstances, and ratified the act by their words and conduct. *See Hogan*, 340 S.E.2d at 122. The Court, therefore, concludes that Plaintiff has sufficiently alleged facts stating a plausible claim for vicarious liability against Defendant Owners for battery. Accordingly, the Court will deny Defendants' motion to dismiss this claim.

### D. <u>Negligent Supervision/Retention by Defendant Owners (Claim 3)</u>

In North Carolina, a plaintiff seeking to hold an employer liable for negligent supervision or retention must prove: "(1) that an incompetent employee committed a tortious act resulting in injury to the plaintiff; and (2) that prior to the act, the employer knew or had reason to know of the employee's incompetency." *Smith*, 202 F.3d at 249–50; *see Efird v. Riley*,

342 F. Supp. 2d 413, 429 (M.D.N.C. 2004) (explaining that, in North Carolina, "a plaintiff must allege that the defendant's employees committed tortious acts of which the defendant had actual or constructive knowledge").

The Court finds that the allegations in Plaintiff's Complaint satisfy both elements of this claim. Specifically, Plaintiff alleges that, Argueta, an employee of Defendant Owners, committed the tortious act of battery[7] when he "repeatedly press[ed] himself against her, attempting to kiss her," (ECF No. 14 ¶ 30), and when he "put one of his hands down her pants," (*id.* ¶ 18.) Plaintiff further alleges that "Argueta has a long history of sexually harassing the waitresses" at the restaurant, (*id.* ¶ 9), and Defendant Owners had been notified "many times over the years" about complaints related to Argueta's "inappropriate conduct," (*id.* ¶ 13). In addition, Plaintiff alleges that Wilkes "had even warned the Defendant Owners repeatedly that Argueta's conduct was going to get the restaurant 'into trouble.'" (*Id.*)

Based on these allegations, the Court concludes that Plaintiff has sufficiently alleged facts to state a plausible claim for relief as to her negligent supervision or retention claim

---

[7] Plaintiff also argues that her allegation of sexual harassment, under Title VII, serves as an additional tortious act underlying this claim. (ECF No. 21 at 14.) The Court recognizes that, in North Carolina, the issue of whether a plaintiff may base its claim of negligent supervision or retention on a Title VII violation has not been squarely addressed by North Carolina appellate courts. *See Jackson v. FKI Logistex*, 608 F. Supp. 2d 705, 707–08 (E.D.N.C. 2009). As a result, some federal district courts in North Carolina have held that, on a negligent supervision or retention claim, a Title VII violation may constitute a tortious act under law, *see, e.g., Efird*, 342 F. Supp. 2d at 429–30; yet other federal district courts in North Carolina have held that, in North Carolina, a Title VII violation does *not* serve as a tortious act for purposes of a negligent supervision claim, *see, e.g., Rathbone v. Haywood Cty.*, No. 1:08cv117, 2008 WL 2789770, at *3 (W.D.N.C. July 17, 2008). Additionally, the Fourth Circuit, in its decision in *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 719 (4th Cir. 2003), construed North Carolina law to require a *common law* tort, rather than a statutory tort, to serve as the basis for a negligent supervision or retention claim. For purposes of the instant motion, however, because Plaintiff also alleges the common law tort of battery in connection with her negligent supervision or retention claim, this Court need not decide whether North Carolina law recognizes Title VII violations as tortious acts on which a plaintiff may base a negligent supervision or retention claim.

against Defendant Owners. Thus, the Court will deny Defendants' motion to dismiss this claim.

### E. <u>Punitive Damages against all Defendants (Claim 5)</u>

Plaintiff seeks punitive damages in this case. Defendants argue that "Plaintiff's speculations, conclusions, and assertions masquerading as factual allegations do not provide a plausible basis for a claim for punitive damages, and as such, the claim for punitive damages should be dismissed." (ECF No. 18 at 19.)

With respect to Plaintiff's federal claim, a Title VII plaintiff may seek to recover punitive damages against an employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Likewise, as to Plaintiff's state law claims, North Carolina law permits recovery of punitive damages in actions involving fraud, malice or willful and wanton conduct. *See* N.C. Gen. Stat. § 1D-15.

Here, Plaintiff has alleged sufficient facts, (*see* ECF No. 14 ¶¶ 9–14, 18, 21–22, 24–28), to show that Defendants acted "deliberately, intentionally, purposefully, maliciously, and otherwise in a willful and wanton fashion," (*id.* ¶ 47). The Court finds that the allegations in Plaintiff's Complaint, (*see id.* ¶¶ 9–14, 18, 21–22, 24–28), taken as true, are sufficient to support Plaintiff's claim for recovery of punitive damages as to her federal and state law claims. The Court will, therefore, deny Defendants' motion to dismiss Plaintiff's claim for punitive damages.

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 15) is DENIED in its entirety.

This, the 31st day of March, 2017.


     /s/ Loretta C. Biggs
United States District Judge